## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| PAMELA LOWE, | Case No.: 09-CV-653-REB |
| Plaintiff | **MEMORANDUM DECISION AND ORDER RE:** |
| vs. | **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Docket No. 100)** |
| IDAHO TRANSPORTATION DEPARTMENT, et al., | |
| Defendants. | **DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (Docket No. 117)** |
| | **PLAINTIFF'S MOTION TO STRIKE (Docket No. 130)** |

Now pending before the Court are (1) Plaintiff's Motion for Partial Summary Judgment (Docket No. 100), (2) Defendants' Motion for Partial Summary Judgment (Docket No. 117), and (3) Plaintiff's Motion to Strike (Docket No. 130). Having carefully considered the record, participated in oral argument, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

### I.  SUMMARY OF DECISION

The parties in this case have each filed a motion for partial summary judgment, asking the Court to rule as a matter of law upon the meaning of Idaho Code section 40-503. Plaintiff Pamela Lowe ("Lowe") contends that she was wrongfully terminated from her position as the

**MEMORANDUM DECISION AND ORDER - 1**

Director of the Idaho Transportation Department ("ITD") – a named Defendant in this action.

Section 40-503 provides in relevant part:

> The [ITD] director shall serve at the pleasure of the board and may be removed by the board for inefficiency, neglect of duty, malfeasance or nonfeasance in office.

Lowe contends that section 40-503 grants her a property interest in her continued employment, which requires, as a matter of constitutional law, that she be given notice of any claimed problems with her performance as Director, and an opportunity to respond to those allegations (referred to in the law as "due process") before she could be removed from her position. The ITD-related Defendants contend that the statute does not grant such rights, that Lowe was an "at-will" employee who could be terminated at any time, and that the reasons set out in the statute for her removal do not give rise to a property interest in continued employment in any event. ITD's position is drawn from its contention that the ITD Board has unfettered discretion upon the termination of the Director, given the language in the statute that the Director "shall serve at the pleasure of the board."

The Court has a responsibility to apply the plain, obvious, and rational meaning of the statute, if that meaning is readily apparent. The Court also must seek to give meaning to each word in the statute, not emphasizing some words to the exclusion of others. If, on the other hand, the statute is ambiguous, the Court may consider extrinsic evidence to assist it in discerning the intent of the Legislature in enacting the legislation, so that the Court has further guidance in interpreting the statute in a way that meets the intention of the Legislature.

The record in this case contains voluminous records of government activity in the early 1970s, when Idaho state government was extensively reorganized and when the ITD was first

**MEMORANDUM DECISION AND ORDER - 2**

created.  There are numerous sworn statements from various politicians, including several former governors and former legislators, and from multiple public employees, including agency directors and former staff employees.  The great bulk of this evidence was submitted to the Court in support of the parties' respective positions on the perceived intent of the Idaho Legislature in creating the ITD, and the position of the ITD Director, in 1974.  In addition, there is extensive briefing containing the argument of counsel for the parties upon these issues.

After full and thoughtful consideration of that record, the Court rules in this Decision that, under both a plain meaning interpretation of section 40-503 and under the most sensible construction of the statutory meaning intended by the Legislature, Lowe did have a property interest in her employment with ITD, and that she was entitled to due process before she could be discharged from her employment.  The Court rules that section 40-503 provides that the ITD Board is charged with hiring and firing the ITD Director.  The hiring of the Director is constrained by the requirement that the Director "have knowledge and experience in transportation matters."  The ITD Board may also fire the Director, but that decision is constrained by the requirement that the Director must have done something in his or her employment that, in the judgment of the ITD Board, constitutes inefficiency, neglect of duty, malfeasance, or nonfeasance in office.

This Decision does *not* rule upon the specific due process protections to which Lowe was entitled before she was removed from her position.  The Decision also does *not* rule upon whether or not ITD's actions contemporaneous to the time of  Lowe's dismissal satisfied any due process protections to which she might have been entitled.  Those issues will be the subject of further proceedings in the case.  This Decision simply settles the waters as to whether or not

**MEMORANDUM DECISION AND ORDER - 3**

Lowe had a property interest in her employment, entitling her to due process protections before she could be terminated from her position.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

The factual backdrop to the issues raised by the cross-motions for partial summary judgment is set out at length in the Court's prior orders, and the parties' briefing.  The essential details are recounted again here.

Lowe had been a long-time employee of the ITD, serving in various positions of responsibility since 1993, eventually becoming ITD's Director in January 2007.  She was terminated from that position by the ITD Board in July 2009.  Lowe challenges her termination, contending, among other things, that she had a property interest in her continued employment with ITD and that, by not providing her with an opportunity to challenge the reasons given for her dismissal, she was denied her due process rights.

ITD disagrees, arguing that Lowe was an at-will employee at the time of her firing.  As an at-will employee, ITD further argues that Lowe was not entitled to procedural protections and, thus, did not have a property interest in continued employment as ITD Director.

Whether Lowe had a property interest in her continued employment as ITD Director turns on the application of Idaho Code section 40-503.  Under that section:

> The [ITD] director shall serve at the pleasure of the board and may be removed by the board for inefficiency, neglect of duty, malfeasance or nonfeasance in office.

*See* I.C. § 40-503(1).  Through her Motion for Partial Summary Judgment, Lowe argues that section 40-503's inclusion of specified reasons for removal in the statute reflects, as a matter of law, the Idaho Legislature's intent to provide ITD's Director with an expectation of continued

**MEMORANDUM DECISION AND ORDER - 4**

employment after initial appointment – terminable only for cause after due process.  In contrast, but also relying on the statute's own wording, ITD moves for partial summary judgment on the same issue, countering that section 40-503's reference to the ITD's Director serving "at the pleasure" of the ITD Board, and the absence of any fixed term of employment, demonstrate the at-will nature of the ITD Director's employ – one that carries no corresponding expectation of continued employment.

Although this case is now before the Court on cross-motions for partial summary judgment, it has been at issue for some time and the parties already have engaged in extensive motion practice, briefing, and discovery.  Their skirmishing first began with Lowe originally filing a motion for partial judgment on the pleadings.  The briefing on Lowe's initial motion was comprehensive; the record, however, was not, because that motion was made upon the pleadings, not a fully-developed record.

In response, the Court wrote a "proposed" memorandum decision and order.  *See* Prop. Mem. Decision and Order, attached to Req. for Add'l Briefing (Docket No. 47).  Such an avenue is unusual, though not unprecedented.  The Court chose such a procedural route because much of the evidence and argument in the record centered about the issue of what the Legislature had in mind at the time section 40-503 was enacted.  If deemed to be ambiguous, the question of the Legislature's intentions informed the Court's thinking in considering whether the exercise of statutory construction would lead to the same meaning reached by the Court as to the plain, obvious, and rational meaning of the statute's language.  However, the Court was concerned that the emphasis in its proposed decision drew upon areas of the record and argument that the parties had not fully developed in their own briefing.  Accordingly, the Court did not enter the proposed

**MEMORANDUM DECISION AND ORDER - 5**

decision as an order, but rather invited the parties to submit additional briefing on the subject of the legislative record and the intent of the legislation.

Even though the parties had previously provided some legislative history in the initial briefing on Lowe's motion for partial judgment on the pleadings, and even though the Court had done additional research on its own into matters that seemed clearly appropriate for judicial notice, the subsequent requested briefing from the parties unexpectedly dwarfed what had been done before. Extensive records of the Idaho Legislative Reorganization Commission ("Commission"), which developed a plan for the reorganization of state government in 1973 and early 1974, were submitted to the Court, along with dozens of pages of the record of legislative committee work on the same. Multiple declarations were submitted from persons who had been in or around the reorganization process.

After receiving and reviewing the submitted material – consisting of hundreds of pages of new briefing and supporting materials – the Court requested that the parties prepare new motions for partial summary judgment on the issue, so that there would be no remaining constraints or procedural limitations upon the Court's ability to fully consider all of the more fully-developed record. *See* 3/31/11 Mem. Decision and Order (Docket No. 78). The parties have since done so, also filing ancillary motions related to the evidentiary issues raised by the nature of the new record. Multiple requests for page limitation waivers and briefing deadline extensions were received, and granted. After the record was finally settled, the Court heard oral argument, and now issues this Decision.

### III.  DISCUSSION

A.    **Cross Motions for Summary Judgment: Standard of Review**

A principal purpose of summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is " not a

**MEMORANDUM DECISION AND ORDER - 6**

disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 256-57. The non-moving party must go beyond the pleadings and show "by [its] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex,* 477 U.S. at 324.

The party bearing the burden of proof at trial "must establish beyond controversy every essential element of its . . . claim." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003) (adopting decision of district court "as our own"). A party who does not have the burden "may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact." Fed. R. Civ. P. 56(c)(1)(B) advisory committee's note.

As a general rule, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch.*

**MEMORANDUM DECISION AND ORDER - 7**

*Dist.,* 237 F.3d 1026, 1029 (9th Cir. 2001) (quoting *Forsberg v. Pac. Northwest Bell Tel.Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)).  Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts."  *S. Cal. Gas Co.*, 336 F.3d at 889.  An exception to this rule exists when cross-motions for summary judgment are filed.  In that case, the Court must independently search the record for issues of fact.  *Fair Housing Council of Riverside Co., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).  Cross-motions for summary judgment – where both parties essentially assert that there are no issues of material fact – does not vitiate the court's responsibility to determine whether disputed issues of material fact are present.  *Id.*  Accordingly, since a court already has a duty to review the record to resolve cross motions for summary judgment, the *Carmen* line of cases discussed above does not apply to cross-motions.

In this case, there are strongly opposing personal views expressed by some declarants as to their understanding of the meaning of section 40-503, a disagreement also reflected in the parties' briefing and argument.  However, those differences are matters of argument and not contested issues of material fact.  The Court is satisfied that there are no genuine issues of material fact upon the facts relied upon in this Decision.

**B.     Statutory Interpretation/Construction of Idaho Code Section 40-503**

In *Johnson v. N. Idaho Coll.*, 2008 WL 4000128 (D. Idaho 2008) (unpublished) (reversed on other grounds), U.S. District Judge Edward J. Lodge outlined the protocol for construing statutes in Idaho.  Finding no reason to depart from its rationale (the parties supply no contrasting authority), it will be applied here:

> In Idaho, when construing a statute, the focus of the Court is to give effect to the intent of the Legislature.  The goal is to give effect to the

**MEMORANDUM DECISION AND ORDER - 8**

purpose of the statute and the legislative intent enacting it, which may be implied from the language used or inferred on grounds of policy or reasonableness.  Statutory interpretation begins by examining the plain language in the statute.  Where the language is unambiguous, it must be given its plain, obvious, and rational meaning.  However, where the language of the statute is ambiguous, absurd, incomplete, or arguably in conflict with other laws, the Court looks to rules of construction for guidance.  To ascertain the intent of the Legislature, not only must the literal words of the statute be examined, but also the context of those words, the public policy behind the statute, and its legislative history.  Constructions that would lead to absurd or unreasonably harsh results are disfavored.

*See id.* at \*11 (internal citations omitted); *see also St. Luke's Reg. Med. Ctr. v. Bd. of Comm'rs of Ada County*, 203 P.3d 683, 685 (Idaho 2009) ("function of the Court is to determine and give effect to the legislative intent").

Recognizing that the interpretation of section 40-503 is a question of law, this Court must first examine the statute's literal words.  If plain and not ambiguous, effect is given to the statute as-written, without engaging in further statutory construction.  *See Twin Falls Cnty. v. Cities of Twin Falls and Filer*, 146 P.3d 664, 668 (Idaho 2006) (dissent) ("Where a statute is unambiguous, statutory construction is unnecessary and courts are free to apply the plain meaning.") (citing *Martin v. State Farm Mut. Auto. Ins. Co.*, 61 P.3d 601, 603 (Idaho 2002)).

Importantly, parties' differing interpretations do not operate as a *de facto* finding of ambiguity.  *See Twin Falls Cnty.*, 146 P.3d at 668 (citing *Rim View Trout Co. v. Higginson*, 828 P.2d 848, 852 (Idaho 1992)).  If ambiguous, however, the Court next engages in statutory construction to ascertain the legislative intent and, in turn, defer to that intent, including the statute's literal words, its context, the public policy behind the statute, and its legislative history. *See Twin Falls Cnty.*, 146 P.3d at 668 (citing *State v. Rhode*, 988 P.2d 685, 688 (Idaho 1999)).

**MEMORANDUM DECISION AND ORDER - 9**

C.     **Idaho Code Section 40-503's Meaning**

The instant dispute turns first upon the meaning of section 40-503.  If the Court were to agree with ITD's statutory interpretation, the issue would be resolved.  ITD has a further argument, however, that even if the Court were to agree with Lowe's interpretation of the statute, the language Lowe relies upon nevertheless does not give rise to a constitutionally-protected right.  The parties are in polite, but strident, disagreement about these two issues.  The Court will address them in turn.

1.     Step One:  Idaho Code Section 40-503's Plain Meaning

Because "the best guide to legislative intent is the words of the statute itself," the interpretation of a statute must begin with the literal words of the statute.  *See In re Permit No. 36-7200*, 828 P.2d 848, 853 (Idaho 1992).  Here, both Lowe and ITD argue that Idaho Code section 40-503's plain meaning coincides with their respective statutory interpretations.

Lowe contends that "the plain meaning of the words in the statute make clear that the Director can only be removed for cause."  *See* Pl.'s Mem., pp. 5-6 (Docket No. 22) ("The statute provides termination of the Director for only limited reasons.  Specifically, the Director may be removed by the Board only for 'inefficiency, neglect of duty, malfeasance or nonfeasance in office.'"); *see also* Pl.'s Mem. in Supp. of Mot. for Partial Summ. J., pp. 4-9 (Docket No. 101).

ITD contends that the Director's "servi[ce] at the pleasure of the board" unequivocally "creates an employment relationship that 'is at the will of the authority which appointed the officer.'" *See* Defs.' Opp., pp. 5-6 (Docket No. 28); *see also* Defs.' Mem. in Supp. of Mot. for Partial Summ. J., pp. 5-9 (Docket No. 118).  In this nuanced respect, ITD argues that, "while [section] 40-503 lists subjective grounds for removal, because of the 'serve at the pleasure'

**MEMORANDUM DECISION AND ORDER - 10**

language, the ITD Board has exclusive discretion to decide whether any of those grounds exist."
*See* Defs.' Resp. to Req. for Add'l Briefing, p. 12 (Docket No. 50).

Lowe's account of section 40-503's purported plain meaning is not without infirmities.
First, it leapfrogs the statute's explicit direction that the ITD Director "shall serve at the pleasure
of the board" and, by doing so, fails to reconcile the arguable conflict within the section's
operative sentence. Second, notwithstanding the general understanding that the term "may"
connotes discretion, the Legislature made frequent use of the term "shall" throughout other
portions of Idaho Code section 40-503,[1] highlighting the possibility that the Legislature's use of
the term "may," rather than other, more concrete, limiting language was a deliberate attempt to
differentiate mandatory conduct from permissive conduct. *See Jama v. Immigration and
Customs Enforcement*, 543 U.S. 335, 346 (U.S. 2005) ("The word "may" customarily connotes
discretion. That connotation is particularly apt where, as here, "may" is used in contraposition to
the word "shall" . . . ").[2] Third, there is no fixed statutory term for an ITD Director's employ,

---

[1] For example, Idaho Code section 40-503 states in part: "the board *shall* appoint a director having knowledge . . ."; "[t]he director *shall* serve at the pleasure of the board . . ."; "[t]he director *shall not* hold any other public office, nor any office in any political committee or organization, and *shall* devote full time . . ."; "[t]he director *shall* receive compensation as the board may determine and *shall* be reimbursed for all actual and necessary travel and expenses incurred by him . . . ." *See* I.C. § 40-503.

[2] Still, it would be a mistake to presume that the words "may" and "shall" always have but one understood meaning. *See, e.g.*, *Summers v. Dooley*, 481 P.2d 318, 320 (Idaho 1971) (concluding "may" in context of given statute to be mandatory in nature, finding "[w]hether a statute is mandatory or directory does not depend upon its form, but upon the intention of the legislature, to be ascertained from a consideration of the entire act, its nature, its object, and the consequences that would result from construing it one way or the other."); *Hollingsworth v. Koelsch*, 280 P.2d 415, 418 (Idaho 1955) ("In determining whether a statute mandatory in form should be construed as directory or permissive, the meaning and intention of the Legislature must govern as the same may be ascertained not only from the phraseology of the statute but also

**MEMORANDUM DECISION AND ORDER - 11**

suggesting (as Lowe's counsel, in fact, stated during oral argument) that the ITD Director will

remain in his or her position indefinitely, regardless of changes in the elected officials, or the

makeup of the ITD Board, over time.[3]  Fourth, "statutes that are in *pari materia*, *i.e.*, relating to

the same subject, should be construed harmoniously, if possible, so as to further the legislative

intent."  *See State v. Gamino*, 230 P.3d 437, 438-39 (Idaho Ct. App. 2010).

    ITD's position is also less-than-airtight.   Particularly problematic is the inexact fit of

ITD's argument that its Director is an at-will employee who may be dismissed at any time upon

———————————

by considering its nature, design and the consequences which would follow from construing it
one way or the other."); *Overland Co. v. Utter*, 257 P. 480, 483 (Idaho 1927) ("[A] statute may
be mandatory in form, but, if it is not clear that it was the intention of the Legislature that it
should be so construed, courts may construe the mandatory words to be directory only."); 82
C.J.S. *Statutes* § 491 (2010) ("The determination of whether a statute is mandatory or directory
does not necessarily depend on the form of the statute.  Words of a permissive character may be
given a mandatory significance in order to effect the legislative intent where the clear intent of
the statute, as shown by the context demands such a construction.  Likewise, the language of a
statute however mandatory in form may be deemed directory when necessary to carry out the
legislative purpose.").

    [3]  Ironically, a case Lowe originally cited - *Humphrey's Executor v. United States*, 295
U.S. 602 (U.S. 1935) - assists on this point when it discusses *Shurtleff v. United States*, 189 U.S.
311 (U.S. 1903) and the maxim *expressio unius est exclusio alterius.*  In the context of the
President's removal of a general appraiser of merchandise for causes other than those stated
under the applicable Act, the Court held :

> [The rule expressed in the maxim] "should not be accorded controlling weight when
> to do so would involve the alteration of the universal practice of the government for
> over a century, and the consequent curtailment of the powers of the Executive in
> such an unusual manner." . . . .   That opinion, after saying that no term of office was
> fixed by the [A]ct and that, with the exception of judicial officers provided for by the
> Constitution, no civil officer had ever held office by life tenure since the foundation
> of the government, points out that to construe the statute as contended for by
> Shurtleff would give the appraiser the right to hold office during his life or until
> found guilty of some act specified in the statute, the result of which would be a
> complete revolution in respect of the general tenure of office, effected by implication
> with regard to that particular office only.

*See Humphrey's Executor*, 295 U.S. at 622 (quoting *Shurtleff*, 189 U.S. at 316).

**MEMORANDUM DECISION AND ORDER - 12**

the ITD Board's discretion, into section 40-503's explicit reference to four distinct reasons for removing the Director.  That is to say, ITD's massaged interpretation seems to set aside the Idaho Legislature's specific inclusion of particular types of unsatisfactory job performance into the statute, as if the language was some sort of statutory "aside," a "by the way, some of things you could choose for firing might include these things" remark in passing.  The Court might be inclined to agree with ITD's interpretation of section 40-503, *if* the Legislature simply said the ITD Director "shall serve at the pleasure of the board," without the further proviso, made part of the same sentence, that the Director "may be removed by the board for inefficiency, neglect of duty, malfeasance or nonfeasance in office."  But that is not the case here.

In such crosscurrents, it might seem that ambiguity is inescapable.  However, the fact that different readings can be made of the statute does not automatically equate to ambiguity – were that so, all statutes that are the subject of litigation could be considered ambiguous.  Consider that:

> The plain, obvious, and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover.  Rule of construction to consider object and purpose has no place when words of act leave no doubt.

*John Hancock Mut. Life Ins. Co. v. Haworth*, 191 P.2d 359, 362 (Idaho 1948) (internal citations omitted).  Here, both parties understandably mine section 40-503 for language supporting their own arguments.  Yet, each of the competing templates offered to the Court fails to give sufficient meaning to *all* the words of the statute as this Court must attempt to do.[4]

---

[4]  Both Lowe and ITD cite to a number of cases as support for their particular interpretation of Idaho Code section 40-503.  These cases are of limited assistance, as there are four interrelated components at play here, that, together, largely fall outside the facts of the

**MEMORANDUM DECISION AND ORDER - 13**

      a.     *Discerning the "Purpose" of the Reorganization of the Executive Branch and the Implication of the Treatment of the Hiring and Firing of Other Agency Department Heads (and Agency Boards) Upon the Meaning of Idaho Code Section 40-503.*

In its proposed decision, the Court drew upon the nature of the reorganization of the executive branch of government that had taken place in the early 1970s, which both predated and precipitated the creation of the ITD in 1974.  Included in that analysis was the Court's assessment of the political pressures at play in the various arenas of the executive branch of government, and the Court's conclusion that the Legislature was particularly sensitive to the potential for political mischief in decision-making concerning the State highway system.

Some of the Court's reasoning in that regard was subject to legitimate criticism from ITD.  ITD pointed out that the regional make-up of a state highway board (which is one protection against overtly politically-pressured decision-making on highway decisions) had come into existence *not* with the reorganization of highway department as part of the Commission's work, but rather had existed in statute as the "Board of Highway Directors" for a number of years prior to that.  Therefore, ITD contends that the Court's emphasis upon the political firewall created in the ITD Board as one basis for the Court's reading of section 40-503 was unsupportable as being a pre-existing choice of the Legislature, not a "new" direction drawn at the time of the executive branch reorganization.

---

proffered case law.  Specifically, section 40-503 (1) states that the ITD Director "shall serve at the pleasure of the board," (2) does not include a fixed term, (3) does not discuss notice or hearing requirements, yet (4) does reference four separate failures in performance upon which the ITD Director may be removed.  *See* I.C. § 40-503.  The cited cases, while generally instructive on certain discrete components, do not speak to the melange of issues presented here. In short, Idaho Code section 40-503's language is apparently unique, and the absence of case law addressing the entirety of similar language reflects as much.

**MEMORANDUM DECISION AND ORDER - 14**

ITD also contends that the Court's proposed reading of the statute was completely at odds with the intention of the Legislature toward executive department heads generally.  In that regard, both ITD and Lowe dissect at some length the particular manner in which *other* department employees are appointed, and the nature of their employment relationship, under Idaho law.  *See* Pl.'s Mem. in Supp. of Mot. for Partial Summ. J., pp. 5-7, 12-15 (Docket No. 101); Defs.' Mem. in Supp. of Mot. for Partial Summ. J., pp. 9-13, 21-22 (Docket No. 118).

ITD argues that a close reading of the statutes dealing with other department heads illustrates a consistent intention to treat such positions as "at-will" in nature.  *See, e.g.*, Defs.' Mem. in Supp. of Mot. for Partial Summ. J., pp. 21-22 (Docket No. 118).  Lowe argues that a close reading demonstrates that there was no such consistency.  *See* Pl.'s Mem. in Supp. of Mot. for Partial Summ. J., pp. 5-7 (Docket No. 101).

Despite ITD's argument (and the declaration testimony of various of its witnesses (*see, e.g.*, Andrus Decl. at ¶¶ 10-12 (Docket No. 51); Batt Decl. at ¶¶ 8, 15 (Docket No. 52); Manning Decl. at ¶¶ 35, 39, 44-45 (Docket No. 54); Welch Decl. at ¶¶ 28-31 (Docket No. 55)) that the Legislature intended for all agency heads to be at-will employees, in reality, there are both minor and major differences in the statutes that create the various department heads.  And, because ITD places much of its emphasis upon the *non-classified* nature of the ITD Director position as a source of its purported at-will status, it is also useful to look at the Legislature's treatment of agency board members by way of comparison, as they are also non-classified employees.

If there had been a common mind – a deliberate intention – to treat each and every agency head identically for purposes of their "at-will" employment status, that could have been easily done.  However, although some department heads fit neatly in such a cubbyhole, that is

**MEMORANDUM DECISION AND ORDER - 15**

not universally so.  Rather, there are variations in who has the power to appoint; in whether the agency head position is indefinite in the term of service, or limited to a set time period; in whether the person serves simply at "the pleasure" of the governor (or a board) who made the appointment; in whether or not there are limited circumstances under which the person can be removed from the office; and in whether or not there are procedures that must be followed before that person can be removed from office.  Whatever might have been in the Legislature's collective mind set at the time these various statutes were enacted (particularly when the majority of such statutes were enacted contemporaneously to each other), it demonstrably was not that each and every department head would be treated in identical fashion for hiring and firing purposes.

At the same time, however, the fact that some other department heads (most notably, the Director of the Department of Water Resources) are treated in a manner inconsistent with at-will status does not necessarily mean that the ITD Director is in the same camp.  The ITD Director's employment rights, whatever they may be, are those prescribed by section 40-503, and, as described by the Court in its "proposed" decision, that statute is unlike any other statute of similar purpose in the Idaho Code.

> b.       *If Idaho Code Section 40-503 Limits the Reasons for Terminating ITD's Director, the Language Setting Out Such Reasons is Sufficiently Particularized to Constrain the ITD Board's Discretion in Deciding Upon Termination.*

Arguing in the alternative, ITD contends that whatever reading the Court may give to section 40-503, the statute nonetheless does not confer a property right upon Lowe in this case because the identified reasons for dismissing the ITD Director are too broad and too subjective. Such reasons, according to ITD, are not "particularized standards" that "significantly constrain"

**MEMORANDUM DECISION AND ORDER - 16**

the ITD Board's discretion to remove its Director, thus eliminating any possibility that Lowe has a property interest in her ITD Director employment. *See* Defs.' Mem. in Supp. of Mot. for Partial Summ. J., pp. 1 & 5-9 (Docket No. 118).

"Whether a state statute creates an expectation of entitlement sufficient to create a property interest recognized by federal constitutional law 'will depend largely upon the extent to which the statute contains mandatory language that restricts the discretion of the [decisionmaker].'" *Allen v. City of Beverly Hills*, 911 F.2d 367, 370 (9th Cir. 1990) (quoting *Jacobson v. Hannifin*, 627 F.2d 177, 180 (9th Cir. 1980)). If there are no "particularized standards or criteria that significantly constrain" the discretion of the decision-maker to confer a benefit, no property right/entitlement exists. *Fidelity Fin. Corp. v. Fed. Home Loan Bank*, 792 F.2d 1432, 1436 (9th Cir. 1986). The converse is, of course, true as well. Therefore, in determining whether section 40-503 confers upon the ITD Director a property interest in continued employment, the Court must inspect whether section 40-503 imposes particularized standards or criteria that significantly constrain the ITD Board's discretion to remove the Director.

According to ITD, the language of "shall serve at the pleasure of the board," contained in section 40-503, is "broad discretionary language" that gives the ITD Board "exclusive discretion" as to whether or not the ITD director stays or goes. Such broad discretion, ITD argues, means that "no . . . protectable property interest exists in the position of the Director of ITD." *See* Defs.' Mem. in Supp. of Mot. for Partial Summ. J., p. 18 (Docket No. 118). Here again, however, ITD's argument would give no meaning whatsoever to the remainder of the Legislature's language upon the subject – the four conditions set out in the "may be removed

**MEMORANDUM DECISION AND ORDER - 17**

for" clause.  Even so, the reasons for removal – inefficiency, neglect of duty, malfeasance, or nonfeasance – must still be considered as to whether they amount to particularized standards that significantly constrain the ITD Board's discretion, or whether they are merely surplusage that may supplement, without impeding, the ITD Board's alleged "exclusive discretion," as ITD contends.

"A regulation granting broad discretion to a decision-maker does not create a property interest."  *Doyle v. City of Medford*, 606 F.3d 667, 672-73 (9th Cir. 2010) (citing *Jacobson*, 627 F.2d at 180).[5]  ITD argues that section 40-503's reasons for removal are neither particularized standards upon, nor constraints of, the ITD Board's discretion, because of the "shall serve at the pleasure of" phrase.  *See* Defs.' Mem. in Supp. of Mot. for Partial Summ. J., pp. 5–9, 17-19 (Docket No. 118).  While the cases ITD cites for this proposition can be read to support such an argument, the Court is not convinced that they squarely apply here.

For instance, in *Edwards v. Brown*, 699 F.2d 1073 (11th Cir. 1983), the court addressed an ordinance which provided that an employee "shall serve during good behavior and efficient

_____

[5]  Quoting *Shanks v. Dressel*, 540 F.3d 1082, 1091 (9th Cir. 2008) and *Thorton v. City of St. Helens*, 425 F.3d 1158, 1164-65 (9th Cir. 1998), ITD alternately states that "'[o]nly if the governing statute compels a result 'upon compliance with certain criteria, none of which involve the exercise of discretion by the reviewing body,' does it create a constitutionally protected property interest.'"  *See* Defs.' Mem. in Supp. of Mot. for Partial Summ. J., p. 6 (Docket No. 118).  However *Shanks* and *Thorton* dealt with permit/license applications, the issuance and renewals of which are frequently premised upon compliance with certain identified criteria, independent of any discretion by the respective issuing bodies.  In contrast, in an employment setting like the one highlighted by the instant action, a dismissal "for cause," although understood to generally connote a property interest, necessarily involves elements of discretion when examining whether such "cause" even exists.  In other words, the standards articulated in, for example, *Shanks* and *Thorton* – while logically applicable to the factual scenarios presented therein – do not/cannot represent a "one-size-fits-all" approach to procedural due process claims.  Suffice it to say, though, *in any context*, where decision-makers have the unfettered discretion to impose criteria of their own, "out of whole cloth" creation, there is no constitutionally protected property interest attendant thereto.

**MEMORANDUM DECISION AND ORDER - 18**

service, to be judged by the commissioner or a designee," concluding that, because the ordinance at issue placed no limit on the commissioner's discretion to determine whether an employee had fulfilled the standards of "good behavior and efficient service," it created no protected property interest. *See id*. at 1077 ("Instead of providing for a discharge for cause, we equate this provision with a discharge 'at the will' of the commissioner.").

Similarly, in *Dorr v. Butte Cnty.*, 795 F.2d 875 (9th Cir. 1986), the court found that an employee's *probationary* rejection "may be based on the appointing authority's subjective evaluation of the employee's performance" when the applicable rules defined probationary rejection as "the termination . . . of an employee who in the opinion of the appointing authority fails to demonstrate satisfactory performance in [his] position." *See id*. at 878 ("The power of the appointing authority to determine, on a purely subjective basis, whether a probationary employee has performed satisfactorily undercuts any expectation of continued employment that might otherwise arise by virtue of the requirement that disciplinary dismissal be grounded upon objectively reasonable cause.").

Like *Dorr*, in *Blanton v. Griel Mem'l Psychiatric Hosp.*, 758 F.2d 1540 (11th Cir. 1985), the court found that a *probationary* employee may be discharged if, in the appointing authority's opinion, the employee's six-month working testing period indicates that the employee "is unable or unwilling to perform his duties satisfactorily or that his habits and dependability do not merit his continuance in the service." *See id*. at 1544 ("This provision, giving directions for the appointing authority to use in exercising his judgment, amounts to providing for a discharge 'at the will' of the appointing authority.") (citing *Edwards*, 699 F.2d at 1077).

But here, in addition to the fact that the ITD Director is not a probationary employee (*compare with Dorr* and *Blanton*), section 40-503 provides a structured set of boundaries

**MEMORANDUM DECISION AND ORDER - 19**

(inefficiency, neglect of duty, malfeasance, or nonfeasance in office) that, to the Court's view, does meaningfully  circumscribe and constrain the ITD Board's ability to remove the ITD Director in ways that differentiate this matter from *Edwards*, *Dorr*, and *Blanton*.[6]  Although the distinction would be more stark if there were also a fixed term of employment or a delineated due process protocol, the absence of those factors does not tip the statute into the arena of unfettered discretion, as ITD contends.[7]

_____

[6]  The Court is not persuaded by ITD's references to *Bush v. Am. Honda Motor Co., Inc.*, 227 F. Supp. 2d 780, 797 (S.D. Ohio 2002) and *Sweeney v. Balkcom*, 358 F.2d 415, 420 (5th Cir. 1966).  Although ITD points out that these cases found that "inefficiency" and "malfeasance" are subjective in nature, such terms were not dissected in a procedural due process setting; that is, neither case discussed whether such terms operate to legally constrain anyone's or anything's discretionary authority with respect to employment decisions.  Therefore, these cases are not only non-binding upon this Court, they are substantively inapplicable.  *Compare with Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 539, n.4 (1985) (although within classified employee framework under Ohio's civil service statute, recognizing that civil service employees, who could not be dismissed except for, *inter alia*, incompetency, inefficiency, neglect of duty, and any acts of misfeasance, malfeasance, or nonfeasance in office, maintained property rights in continued employment); *Wheaton v. Webb-Petett*, 931 F.2d 613, 616-17 (9th Cir. 1991) (reversing district court and finding that management service employee, who could not be removed unless "the employee is unable or unwilling to fully and faithfully perform the duties of the position satisfactorily," is "more than an at-will employee" and "[g]ood faith was required in [his] removal process."); *Federal Deposit Ins. Corp. v. Henderson*, 940 F.2d 465, 470, 475-76 (9th Cir. 1991) (finding employment contract's allowance for termination for "a breach of the Agreement, illegal activity, and misconduct injurious to the Bank's interests" as constituting protected property interest, but only for period of time specific to period provided for terminations at-will).

[7]  While it can be argued, as ITD does, that the ITD Board is charged with deciding whether any of these grounds for dismissal exists, such discretion does mean that there are no limits on the ITD Board's ability to remove the ITD Director and, therefore, no property interest. *See, e.g.*, Pl.'s Mem. in Supp. of Mot. for Partial Summ. J., p. 9 (Docket No. 101) ("Even if the Court accepts that the Board had sole authority or exclusive discretion to decide whether there was cause to fire her, this does not undermine Ms. Lowe's property right entitling her to a due process hearing regarding her termination.").  Notwithstanding any discretion inherent with the ITD Board's decision-making authority, there are limits/guidelines/reasons/causes here – four of them – that exist to constrain such decisions.  Otherwise, to adopt ITD's argument would mean that expectations in continued employment (property interests) could rarely exist, even in

**MEMORANDUM DECISION AND ORDER - 20**

c. *Such Terms are Standard Statutory Fare in Idaho*

This Court's conclusion on this issue is buttressed by the fact that Idaho law is replete

with similar language found in other statutes that set out the same (or similar) justifications for

the removal of employees. *See, e.g.*, I.C. § 20-203 ("The governor may not remove any member

of the board [of correction] except for disability, inefficiency, neglect of duty or malfeasance in

office."); I.C. § 33-103 ("The governor is empowered to remove from membership on the state

board [of education] any member who has been proved guilty of gross immorality, malfeasance

in office or incompetency . . . ."); I.C. § 67-4221(e) ("A member of the [park and recreation]

board may be removed for inefficiency, neglect of duty, misconduct in office . . . ."); I.C. § 42-

1803 ("The governor may remove the director of the department of water resources for

inefficiency, neglect of duty, or misconduct in office . . . .").  While these other code sections

may also discuss time stints of employment or due process procedures, the point here is that the

four statutory reasons for the ITD Director's removal are not made invisible by invocation of the

"serve at the pleasure of" language in a statute.  To the contrary, because these same terms are

used over and over, throughout Idaho's state agencies' operative statutes, they must have *some*

corresponding substantive significance.  Said another way, just as ITD argues that the "serve at

the pleasure of" turn of phrase has an understood meaning given its use elsewhere within the

_____

situations where employees can only be dismissed "for cause," because in every instance of an
employee firing based upon some flaw in the employee's performance, some person or persons
has to make a decision that the employee's conduct justifies their termination.  *See, e.g.*, *Warren
v. Crawford*, 927 F.2d 559, 563, n.7 (11th Cir. 1991) (finding Administrator's ability to remove
department head when, in Administrator's judgment, "it is in the best interest of the County" as
"plac[ing] no limit on the Administrator's discretion to determine whether dismissal of a
department head was in the best interest of the County.  *There are no guidelines, reasons, or
'causes' that the Administrator must find before determining that the dismissal of a department
head is [in] the best interest of the County.*") (emphasis added).

**MEMORANDUM DECISION AND ORDER - 21**

Idaho Code and/or case law interpreting those particular words, the same can (and should) be

said for statutory language discussing the reasons for removing an agency employee.  When

doing so, section 40-503's references to inefficiency, neglect of duty, malfeasance, and

nonfeasance in office provide the weight and impact that the section, read in its entirety,

requires.[8]

The implications of ITD's argument seem to reach too far in other ways as well.   Lowe

points out that some of the same terms used in regard to removal of the ITD Director are also

used by the Legislature to define the reasons that allow an ITD Board member to be removed.

*See* Pl.'s Mem. in Supp. of Mot. for Partial Summ. J., pp. 5-6 (Docket No. 101); *compare* I.C.

§ 40-503 ("The director . . . may be removed by the board for inefficiency, neglect of duty,

malfeasance or nonfeasance in office."); *with* I.C. § 40-305 ("The governor may remove any

board member for incompetency, inefficiency, intemperance, misconduct in office, neglect or

dereliction of duty.")

Lowe also highlights the appearance of the same or similar words in many other sections

of Idaho law, including the statutory standards by which *classified* employees under Idaho's

---

[8]  Additionally, although dealing with a different statute (Idaho Code section 20-203),
Idaho's Attorney General has opined that "inefficiency," "neglect of duty," and/or
"malfeasance" represent substantive limits on one's ability to remove a member of the Board of
Corrections in such a way that these members are not removable at-will.  *See* op. Att'y Gen.
(Sept. 9, 1996) (attached as Ex. 2 to Pl.'s Mem. (Docket No. 22, Att. 2)).  Specifically, in
interpreting: "[t]he governor may not remove any member of the board except for disability,
inefficiency, neglect of duty or malfeasance in office . . . .", the Idaho Attorney General
concluded that "Board members are not . . . removable at-will, because the statute . . . *limits the
reasons for which a Board member may be discharged*."  *See id*. at pp. 3-4 (emphasis added).
Idaho Code section 20-203 does not contain the "serve at the pleasure of" language, but does
contain a fixed term of employment and specific notice requirements before termination, unlike
Idaho Code section   40-503.  Nonetheless, the rationale for the Attorney General's opinion has
persuasive value for purposes of this case.

**MEMORANDUM DECISION AND ORDER - 22**

personnel system can be terminated from employment.  *See* Pl.'s Mem. in Supp. of Mot. for

Partial Summ. J., pp. 6-7 (Docket No. 101).

ITD challenges such comparisons by pointing out that none of the statutes relied upon by

Lowe contains the same "at the pleasure of" language found in § 40-503, and others–unlike

§ 40-503 – also contain a prescribed notice and hearing process.  *See* Defs.' Mem. in Supp. of

Mot. for Partial Summ. J., pp. 9-12 (Docket No. 118).

The Court has already noted that section 40-503 is different in some respect from every

other Idaho statute the Court has reviewed that pertains to the employment of a state agency

head, or board member.  But there is no uniformity otherwise, and nearly all of the statutes

dealing with the same subject matter are unique in some way.  Even so, the Legislature has

commonly used the same or very similar terms of reasons for dismissal, as found in section

40-503, in many similar statutes.  Ultimately, the nature of ITD's argument as to the significance

of that fact is circular and unhelpful.  Consider for instance the emphasis given by ITD to the

statutes dealing with the agency board members or agency heads who are not specifically

described as serving "at the pleasure of" the governor, or their board, as the case may be, which

include:

- The Board of Correction: "The governor *may* not remove any member of the board except for disability, inefficiency, neglect of duty or malfeasance in office.  Before such removal, the governor shall give such member a written copy of the charges against him and shall fix the time when he can be heard in his defense . . . ."  I.C. § 20-203 (emphasis added).

- The Board of Education: "The state board of education *shall* consist of . . . seven (7) members appointed by the governor, each for a term of five (5) years. . . . .  The governor is *empowered* to remove from membership on the state board any member who has been proved guilty of gross immorality, malfeasance in office or incompetency . . . ."  I.C. §§ 33-102, 33-103 (emphasis added).

**MEMORANDUM DECISION AND ORDER - 23**

- The Parks and Recreation Board:  "Each member of the board *shall* be appointed by the governor . . ., with the advice and consent of the senate, to serve a term of six (6) years . . . .  A member of the board *may* be removed for inefficiency, neglect of duty, misconduct in office or if he is no longer a resident of the district from which he was appointed."   I.C. § 67-4221 (emphasis added).

- The Director of the Department of Water Resources:  "The director . . . shall be appointed by the governor for a term of four (4) years . . . .  The governor *may* remove the director . . . for inefficiency, neglect of duty, or misconduct in office, delivering to him a copy of the charges and affording him an opportunity of being publicly heard . . . in his own defense . . . ."  I.C. §§ 42-1801, 42-1803 (emphasis added).

Other departments have yet other templates for the appointment and discharge of board members, or directors.  One notable example is the Department of Health and Welfare, which has an eleven member board, of which only seven members are "voting" members.  *See* I.C. § 56-1005.  Those voting members "shall be appointed by the governor, with the advice and consent of the senate," and serve four year terms.  *Id.*  The members appointed by the governor "*may* be removed by the governor *for cause*."  *Id.* (emphasis added).[9]

Such a broad review of the various agencies in Idaho state government, and the various ways in which the directors and boards of those agencies are appointed and the circumstances

_____

[9]  There is no question that the Legislature must have understood the particular nuances and ramifications of the framework in which it placed the Health and Welfare board members, as just a hop and a skip away in Chapter 10 of Title 56 (dealing with the Department of Health and Welfare) is the statute which provides that the director of the department "shall be appointed by and serve at the pleasure of the governor," with no mention of dismissal conditions.  I.C. §  56-1002.  That is a two-sided coin (no doubt ITD would argue that the ITD statute *does* contain the "shall serve at the pleasure" language), but significantly, within the Health and Welfare statute is the reappearance of the "may" word used in conjunction with the reason for which a board member or director can be removed from their office – in other words, that once appointed, that person remains at their desk but the possibility exists that they may nonetheless be removed from their office if their performance falls into one of the statutory reasons for ending that employment.

**MEMORANDUM DECISION AND ORDER - 24**

under which they can be removed from their position is useful to the decision in this case in several respects.  First, it illustrates unmistakably that the "at-will only" status that ITD contends generally exists for non-classified employees in Idaho government (and therefore also exists for the ITD Director), is not a uniform, cookie-cutter, status across state government.  Second, it illustrates that the word "may," in reference to the conditions under which someone's employment may be terminated, is not a statutory aberration in the Idaho Code; rather, it appears frequently in the context of setting out those circumstances under which the person may be terminated from their employment, exactly the use of the word in section 40-503.

> d.    *The Court's Conclusion as to the Plain Meaning of Idaho Code Section 40-503*

The Court has reconsidered its prior proposed ruling upon the plain meaning of section 40-503, with the benefit of the supplemented record, the parties' additional briefing, and oral argument.  Having done so, and in giving meaning and importance to each word of the statute as the Court is required to do under Idaho rules of statutory construction, the Court finds that the plain meaning of section 40-503 is as follows: The phrase "[t]he director shall serve at the pleasure of the board and may be removed by the board for inefficiency, neglect of duty, malfeasance or nonfeasance in office," means that the ITD Board – the entity charged by the Legislature with the mandatory "shall" – has the authority to appoint the Director (as distinct from those positions that are appointed by the governor, or appointed by the governor with the advice and consent of the Senate).  Further, the ITD Board  "may" remove the ITD Director (but is not required to do so) in its discretion, *if* the ITD Board concludes that the Director's job performance is unsatisfactory for one or more of the four enumerated reasons.

**MEMORANDUM DECISION AND ORDER - 25**

Said another way, the ITD Board is charged with hiring and firing the ITD Director.  The nature of the hiring is constrained by Idaho Code section 40-503's requirement that the ITD Director have "knowledge and experience in transportation matters."  I.C. § 40-503(1).  The firing is also the province of the ITD Board, but is constrained by the requirement that the ITD Director must have done, or failed to do, something that, in the judgment of the ITD Board, constitutes inefficiency, neglect of duty, malfeasance, or nonfeasance in office.  If the ITD Director's performance falls within one or more of those categories, the ITD Board may choose to dismiss its Director, but is not required to do so.

This ruling allows the purportedly irreconcilable portions of the statute to be read together to give full meaning to the entire statute.  *See Norton v. Dep't of Emp't*, 500 P.2d 825, 829 (Idaho 1972) ("[A] statute should be construed so that effect is given to all its provisions, so that no part thereof will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another.").

2.  Step Two: Consideration of Extrinsic Evidence to Determine the Legislature's Intended Meaning for Idaho Code Section 40-503

The Court's plain reading of Idaho Code section 40-503 appropriately gives significance to each word of the statute, in a collectively reasonable interpretation.  Nonetheless, the Court acknowledges that the statute is not the model of clarity, and there likely was no thought at the time it was enacted that it would, years later, lead to such a litigation swivet as now exists before the Court.

Idaho Code section 40-503 is awkward.  Nonetheless, even if the Court were to say that the language of section 40-503 is ambiguous so that it is necessary to look to something other than the plain language of the statute to determine its meaning, the Court is still persuaded that

**MEMORANDUM DECISION AND ORDER - 26**

the reading it has given to the statute as a matter of plain meaning is also the intended meaning of the Idaho Legislature.

On this subject of statutory construction, there is a remarkable array of evidence that the parties have placed into the record, including numerous declarations of people with various and sundry connections to the statute, depositions of former directors of the ITD and others, and gigabytes of electronically scanned documents dating from the time of the reorganization of state government in the early 1970s.

A starting point to determine the Legislature's intent is often the legislative package, which includes a statement of purpose. Here, the "Statement of Purpose" prepared by the Commission for Senate Bill 1295, which created the ITD as an executive department of the state, includes a specific reference to the ITD Director's appointment and removal, stating that the Director "shall serve at the pleasure of the board and may be removed *only for stated cause*." *See* Stmt. of Purpose (Docket No. 22, Att. 3); *see also* Proposal No. 12 (Docket No. 49, Att. 9).

On its face, the Statement of Purpose is compelling. However, the Court is mindful that there are other pieces of legislative history. Other materials, such as study commission findings, the text of the introduced bill, amendments, procedural history, journals, committee/interim committee hearing materials, etc. may also be instructive. But the parties acknowledge that little exists in the way of such information. Perhaps in an attempt to fill that void, ITD has supplemented the record with after-the-fact testimony from individuals involved in the reorganization of Idaho state government. These individuals consistently testify that the ITD Director was never intended to be anything other than an at-will position; however, they are altogether unable to explain how, then, section 40-503's actual verbiage can be read to legitimately suggest something different – in fact, quite the opposite.

**MEMORANDUM DECISION AND ORDER - 27**

It is this inability – in essence, the failure to explain how such contradictory language made its way into section 40-503 – that weakens ITD's position on this issue. However, the scope of such evidence, and the particular credentials of those who offer it (including two former Idaho governors), deserved a careful scrutiny, along with the declarations and related evidence put forward by Lowe. The Court has mulled at length over this record before reaching its decision in this case. The Court's assessment of such evidence follows here.

      a.     *Governor Cecil D. Andrus*

Governor Cecil D. Andrus, whose service included the time during his first residency in the governor's office when state government was reorganized as a direct result of his initiative, states that he "only learned at some point late in the process [of the executive branch reorganization] that there would be a position of Director established in the new Idaho Department of Transportation . . . . appointed by the Board." *See* Andrus Decl. at ¶ 10 (Docket No. 51). As to that new position, Governor Andrus says he did not intend "to approve a statute that provided the Director of ITD with job protection or a status different from that of the directors of all the other Idaho departments being established at that time . . . . [and] [i]f that had been the legislative intent, it would have been so unusual that [he is] certain it would have been called to [his] attention." *See id.* at ¶ 11. Governor Andrus, who served longer as governor of Idaho than any other person, states further that "not once during all of those years, or since for that matter, [has he] ever had or received any inclination or suggestion that the Director of ITD did not serve at the pleasure of the board as that term was commonly understood and applied . . . ." *See id.* at ¶ 13.

Significantly, both Governor Andrus and Governor Phil E. Batt (discussed *infra*) agree that the nature of the responsibilities of the ITD required some insulation from political

**MEMORANDUM DECISION AND ORDER - 28**

vagaries.[10]  But the historical perspective they place upon the ultimate meaning of section 40-503

deals with only a part of the evidence placed before this Court.

Governor Andrus makes no specific mention of the problematic "may be removed"

language in the statute, other than to say that he had read the Court's "tentative interpretation of

the Legislature's intent" regarding the new ITD Director, and understood from that, that the

Court's tentative conclusion was that the "Legislature intended to vest the Director of ITD with

rights similar to those enjoyed by a classified or permanent employee." *See id.* at ¶ 4.

However, in the Court's view, the proposition that an ITD Director who had a property

interest in his or her employment created by virtue of section 40-503 was necessarily then

equivalent to a classified employee, is not supported by this record or by the germane statutes

that create the personnel system.  As to whether such a concept for the ITD Director would have

been "so unusual" that it surely would have been brought to his attention (*see* Andrus Decl. at

¶ 11 (Docket No. 51)), the Court has no way to know what may or may not have been happening

behind the scenes on the second floor of the Statehouse.  But, the now nettlesome language was

there in the statute in late 1973 and early 1974 for the governor's staff and all others to see.  *See*

Senate Bill 1295 (Docket No. 49, Att. 10).  Even more difficult to reconcile is the fact of the

Commission's "Explanation" of its proposed legislation, given to the Legislature on January 14,

---

[10]  Governor Batt says that there is a "need for ITD and its programs to be protected from
the possible political consequences of a change in administrations or the political whims and
uncertainties that sometimes follow an election cycle," but he believes that the make-up of the
ITD Board, and its predecessor entity, the Board of Highway Directors, accomplishes that goal.
*See* Batt Decl. at ¶ 9 (Docket No. 52)*.*  Governor Andrus similarly says that ITD, and its
predecessor, was inherently insulated because the Board of Highway Directors were protected
since they were appointed for fixed and staggered terms, could be removed only for cause, and
after a public hearing."  *See* Andrus Decl. at ¶ 10 (Docket No. 51).

**MEMORANDUM DECISION AND ORDER - 29**

1974, which contained the Statement of Purpose for the new ITD statutes, including the unequivocal statement that the "Idaho transportation board shall appoint a director having knowledge and experience in transportation matters, *who shall serve at the pleasure of the board and may be removed by the board only for stated cause*."  *See* Proposal No. 12 (Docket No. 49, Att. 9) (emphasis added).

That such a detail might not have been focused upon by staff in the governor's office when reviewing the minutiae of the admirable, and enormous, effort to bring order to the previously chaotic and balkanized world of state government is certainly conceivable.  But it does not change the fact that the "may be removed" clause, and the Commission's direct and plain explanation that the Director of the new department may be removed only for stated cause, were already footprints in the legislative cement by the time the new ITD, and its Director, were concreted into law by Governor Andrus's signature.[11]

   b.   *Governor Phil E. Batt*

In 1974, former Governor Phil E. Batt was in the midst of his lengthy and much distinguished legislative career, then serving as majority leader of the Idaho State Senate.  He was a member of the Commission charged with the overhaul of the executive branch.  In his declaration, Governor Batt also recounts his instrumental role in the creation of the Idaho Personnel System in 1965, which created the state employee personnel procedures, and the general distinctions between classified employees and nonclassified employees, that still exist today.  *See* Batt Decl. at ¶ 7 (Docket No. 52).

---

[11]   The legislation was passed by the Senate on January 28, 1974, by the House on February 11, 1974, and signed by Governor Andrus on February 18, 1974.  *See* (Docket No. 49, Att. 12).

**MEMORANDUM DECISION AND ORDER - 30**

As with Governor Andrus, Governor Batt says that, during the reorganization process, the Legislature had:

> no intent to make the Director of ITD a permanent ITD employee or to provide the director position with a status or a right to job protection analogous or similar to the rights provided to classified employees.  For the Director of ITD to have such rights or status would have made that position a total anomaly among the directors of the other executive departments within the Idaho state government. There was no intent by the Commission or the Legislature to do that.

*See id.* at ¶ 8.  Governor Batt recognizes the "question or potential ambiguity created by the phrase 'and may be removed for inefficiency, neglect of duty, malfeasance or nonfeasance'" contained in Idaho Code section 40-503, but says he has "no recollection of how or why the 'may' clause was added to this provision of the statute."  *See id.* at ¶ 14.  However, he is certain that it was not the intent of the Commission or the Legislature in 1974 "to vest the Director of ITD with a position remotely analogous to that of a classified employee."  *See id.*  He goes on to say that in his later service as an ITD Board member from 1988 until 1991, he knew "that it would be very detrimental and disruptive if the ITD board did not have discretion to remove its direction 'at its pleasure' without the restriction associated with removing an employee with job protection like that of a classified employee" and that it "never crossed [his] mind . . . that we were limited in such a way."  *See id.* at ¶ 17.

Governor Batt's declaration reflects the precise and careful thinking that has marked the public service for which he has long been admired.  But certain of his observations are belied by other evidence in the record.  For instance, despite his firm belief that there was never any intent to make the ITD Director a permanent ITD employee similar in nature to a classified employee (*see id.* at ¶ 8), he was a member of the Commission and would have had on his desk the same

**MEMORANDUM DECISION AND ORDER - 31**

statutory language, and Commission explanation, described earlier. What other Commission members may have thought of that language, and their intentions upon the same, he cannot say. Additionally, in the January 30, 1974 meeting of the Senate's *ad hoc* "Executive Reorganization Committee," then Senator Batt seconded the motion to send Senate Bill 1295, which contained the legislation creating the Director's position in the newly-created ITD and its "may be removed" language, to the floor with a do-pass recommendation.  *See* (Docket No. 49, Att. 11).

　　　Finally, even though the nature of the ITD Director's employment may well have been different than many of the executive agency heads, it does not seem to have been anomalous.  As previously described, Idaho law contains a variety of different statutory provisions regarding the appointment and service of non-classified employees, such as agency board members and agency directors. Even at the contemporaneous moments of the creation of the ITD, other positions were also being created that were not of the "at-will" model focused upon by ITD's declarants.  In one such example, then Senator Batt made a specific motion during the December 20, 1973 meeting of the Commission to change the Commission's tentative proposal for the director of the Department of Water Resources from one which called for the director to be appointed by the governor and to serve at the governor's pleasure, to one which called for the director to be appointed by the governor to serve during the same period of time as the governor, but with the added limitation that the director could "be removed only for cause."  *See* 12/20/73 Minutes (Docket No. 49, Att. 6).  The motion passed, and the ultimate, Commission-prepared, legislation for the Director of Water Resources position contained the same "may be removed" language that appears in section 40-503, along with similar reasons for removal, *e.g.*, "inefficiency, neglect of duty, or misconduct in office."  I.C. §§ 42-1801, 1803.

**MEMORANDUM DECISION AND ORDER - 32**

c.    *General Darrell Manning*

General Darrell Manning, one of Idaho's most storied and well-regarded of citizen servants, has a multi-angled perspective upon the question, as he served as a lay member of the Commission (following earlier service in both the Idaho House of Representatives and the Idaho Senate), as a member of the ITD Board, and an ITD Director (the ITD's first Director).  But, also of significance, he is a Defendant in this case, having been the Chairman of the ITD Board at the time the decision was made to terminate Lowe's employment.  *See* Manning Decl. at ¶¶ 3-4 (Docket No. 54).[12]

General Manning recounts his memory of the work of the Commission, as refreshed by his review of the records kept in the State Archives concerning its work, and he says that he is certain there was "never any discussion" that the new ITD Director position "would have job protection analogous or similar to a classified employee."  *See id*. at ¶ 35.  He says that "[t]he Commission's and the Legislature's intent was for the director position to be exempt from the Personnel System Act [and] [b]y virtue of being appointed by the ITD Board and serving at its pleasure, and being an exempt position, the Director of ITD was not intended to be a protected or permanent employee with rights or status akin or similar to a classified state employee."  *See id*. Not surprisingly then, General Manning also says that when he served as the ITD Director, he believed that "if the Board became dissatisfied with me or my performance, my employment could be terminated at any time."  *See id*. at ¶ 38.

---

[12]  General Manning's declaration also recounts other details of his remarkable career in government, including his service as the Adjutant General of the Idaho National Guard, the executive director of, and later a board member of, the Idaho State Board of Education, the administrator of the Division of Financial Management, and the acting Director of the Department of Health and Welfare.  *See* Manning Decl. at ¶¶ 5-10 (Docket No. 54).

**MEMORANDUM DECISION AND ORDER - 33**

General Manning also says that in 1973 he read the report titled "A Tentative Proposal for the Reorganization of Idaho State Government," which he says was "the product of the Commission's work over the preceding seven months." *See id*. at ¶ 39.  This report was made available to the public, and the Commission then held a series of public hearings around the state to receive public input regarding the proposals, in order to consider such input before submitting a final set of recommended proposals to the Legislature in January of 1974.  *See id*.  He recalls no discussion during that process of the ITD Director position being "anything other than an exempt employee, serving at the pleasure of the board."  *See id*.

General Manning then says that he is "aware now" that the Commission Proposal 12 (for the new ITD) contained the phrase "and may be removed by the board only for stated cause" after the language "shall serve at the pleasure of the board."  *See id*. at ¶ 40.  He says that he also knows that the section of the legislation adding the ITD Director's position "contains the phrase 'and may be removed for inefficiency, neglect of duty, malfeasance or nonfeasance' after the phrase 'shall serve at the pleasure of the board.'" *See id*.  However, he goes on to say that he does not know the source of that language, does not know who suggested "the addition of these phrases," and has no memory of having discussed them.  *See id*.  He says further that although he read Proposal No. 12 as it was submitted to the Legislature in January of 1974, and he read the proposed legislation, he does not recall the relevant phrases and does not recall "attaching any particular significance to them in terms of altering or changing the legislative intent that the director served at the pleasure of the board."  *See id*. at ¶ 41.

Here also, a person who was very close to the stage as this particular legislation moved forward, expresses no knowledge, nor understanding, of how the "may be removed" language

**MEMORANDUM DECISION AND ORDER - 34**

was enacted into law. The person who also served as the first Director of ITD, and then in multiple periods as an ITD board member, seems to indicate that until this litigation arose, he was unaware that section 40-503 contained any language that might be read to limit the manner in which the ITD Director could be removed from that employment.

General Manning's view of how Idaho Code section 40-503 should be interpreted would call on the Court to rule as though such language never existed, apparently as he and Governors Batt and Andrus would say was the assumption they had maintained all along. But the record shows that the "may be removed" clause was not some gremlin's handiwork that created a statutory jack-in-the-box. To the contrary, the relevant language is set in the same font and type size as every other part of the legislation, and, in addition, the particular result portended by the legislation as it pertained to the ITD Director was explicitly described in the Commission's "Explanation," previously referenced. *See* Proposal No. 12 (Docket No. 49, Att. 9) (emphasis added). Finally, as has already been described, the ITD Director's position was only one of a number of director or agency board positions that were fashioned as something other than purely at-will employee positions, even though such positions were not classified positions.

        *d.*    *Joe Welch*

ITD also calls upon Joe Welch for his recollection of the process by which the ITD was created. Mr. Welch had been a staff member with Governor Andrus prior to his appointment as the Assistant Director of the Commission. *See* Welch Decl. at ¶ 1 (Docket No. 55). Mr. Welch recounts the work he did for the Commission, including the work that was done by the staff in preparing draft proposals for the reorganization at the direction of the Commission. *See id.* at ¶ 2.

**MEMORANDUM DECISION AND ORDER - 35**

In all, there were three successive sets of draft proposals.  *See id*. at ¶¶ 11-12.  The third such set of proposals were "comprehensive and detailed," including as they pertained to the new form of the ITD.  *See id*.  Before any of the draft materials were finalized, they were reviewed and approved by former Governor Robert Smylie, who served as legal counsel to the Commission.  *See id*. at ¶ 17.  Governor Smylie also had an immediate understanding of the issues involved in how employees were selected, and retained or not retained, as he had been "instrumental in creating the Idaho Personnel System during his administration."  *See id*. at ¶ 13.

Mr. Welch also claims no knowledge of the origin of the "may be removed" clause pertaining to the ITD Director.  *See id*. at ¶ 27.  Yet, he otherwise describes a careful and thorough process that the Commission, its staff, and its counsel went through in preparing and revising drafts, and submitting the final recommended proposals to the Legislature.[13]  He confirms that the legislation ultimately enacted and signed by Governor Andrus was in exactly the same form as had been recommended by the Commission.  *See id*. at ¶ 26.  His declaration implies that the "may be removed" language must have been some sort of mistake, without any explanation for how such a mistake might have occurred, saying: "I know that the Commission did not discuss or consider the concept or suggestion that the Director of the ITD should be anything other than an exempt employee, serving at the pleasure of the Board."  *See id*. at ¶ 28.

     *e.*    *Kermit Kiebert*

Kermit Kiebert, a former state legislator and former ITD Director, provides a declaration submitted by ITD in which he says that when he was the ITD Director, he understood that he

---

[13] Welch's declaration does not explicitly identify his own direct involvement in the ITD draft proposals, or the ultimate final recommendation as to the same, or the "explanation" of the same given by the Commission to the Legislature.  He was not the only staff member working with the Commission.  The Court is left to presume from such lack of detail that Mr. Welch was either not directly involved in the drafting of the particular proposals for the ITD, or does not recall the particular details of his work in that regard if he was directly involved.

**MEMORANDUM DECISION AND ORDER - 36**

was an at-will employee who could be terminated at the pleasure of the ITD Board. *See* Kiebert

Decl. at ¶¶ 2-5 (Docket No. 120).  Mr. Kiebert, who was accused of a felony crime while he was

serving as the ITD Director (for which he was later acquitted) goes on to say that, after he was

charged with that crime, he was placed on unpaid administrative leave, and:

> [w]hile on leave, I distinctly recall that the Governor at the time,
> Cecil Andrus, requested that the ITD Board terminate me as Director.
> The ITD Board refused the Governor's demand *because there was no*
> *justifiable reason to terminate me*, and they did not accede to the
> Governor's request because I worked for them, and not the Governor.
> Only the Board had the authority to appoint me and also to fire me.

*See id.* at ¶ 8 (emphasis added).

Mr. Kiebert's declaration reflects the battle of wills that occurred between Governor

Andrus and the ITD Board at the time of his criminal case, but perhaps unintentionally he also

highlights the very distinction that ITD wants the Court to overlook in this case.  That is, the ITD

Board has the authority to hire and fire the Director, *but* if the Board chooses to fire the Director,

the Board must do so for one of the "justifiable" (to borrow Mr. Kiebert's word) reasons set out

in section 40-503.

Mr. Kiebert also says that he left ITD "for personal reasons...and for professional

reasons.  "My professional reasons for leaving the Department included that *both the ITD Board*

*and I felt that at the time the Director position was no longer a good fit for me or for ITD.*"  *See*

*id.* at ¶ 10 (emphasis added).  The disconnect, of course, is that Mr. Kiebert's stated

understanding of his at-will employment relationship with ITD would lend no importance

whatsoever to whether he felt that the Director position was no longer a good fit for him, at the

same time that the ITD Board felt that the position was no longer a good fit for him as well.

**MEMORANDUM DECISION AND ORDER - 37**

Mr. Kiebert also states in his declaration that his interpretation of section 40-503 "was consistent with the ITD Board's interpretation and how the Board had viewed its past directors." *See id*. at ¶ 7. Certainly that is true with General Manning's declaration, as discussed earlier, but it is not true as to others. For instance, Lowe says that she worked at ITD under prior Directors Dwight Bower and David Ekern. *See* Lowe Decl. at ¶ 3 (Docket No. 104). She says that she was frustrated with Director Ekern's management, and was told by high level officials in ITD that "the Board could not just fire Mr. Ekern because there was Idaho law that required cause justifying his termination." *See id*. at ¶¶ 4-5. She also states (and the Court acknowledges the potential for her bias in doing so) that when she became the ITD Director, she received an "appointment letter" stating that she was a nonclassified employee, and thus "at-will," but that she nonetheless understood from what she had been previously told, that she was "confident that I could only be removed as Director for cause." *See id*. at ¶ 8.

        f.     *Frank Bruneel*

Frank Bruneel, another former Chairman of the ITD Board (including at the time that Ms. Lowe was hired as the ITD Director), submitted a declaration filed by Lowe that describes his role and that of the ITD Board in the departure of David Ekern, another prior Director. *See* Bruneel Decl. at ¶ 1 (Docket No. 105). He testifies about the nature of his knowledge of the Director's position, and the process by which the ITD Board went about ending its relationship with David Ekern. His testimony on those matters is at least as supportive of Lowe's reading of section 40-503, as it is of the "at-will" position urged by ITD. *See id*. at ¶¶ 2-9.[14]

---

[14] The Court has considered, in this regard, the Declaration of Carlin Hill, which sets out in great detail Ms. Hill's understanding of how certain ITD Directors were paid for accumulated sick leave, vacation leave, or other accouterments of their employment at the time that such

**MEMORANDUM DECISION AND ORDER - 38**

g.     Richard Hutchison

Lowe offers the declaration of Richard Hutchison, who is perhaps the most expert of all

the outside viewpoints on the intricacies of state employment in Idaho.  Mr. Hutchison spent his

entire working career in Idaho state government, including 12 years as the Deputy Director of

the Idaho Personnel Commission, followed by 15 years as the Director of that Commission, from

which he retired.  *See* Hutchison Decl. at ¶¶ 2-3 (Docket No. 106).  Mr. Hutchison says that in

his over 25 years at the Personnel Commission, he "gained a wealth of knowledge and expertise

about civil service employees in Idaho and particularly with respect to state employees' due

process protections and rights."  *See id.* at ¶ 5.

Mr. Hutchinson was asked to assist the ITD Board in a search for a new Director in 1993,

at the request of the then-ITD Board Chairman, Jack Combo.  *See id.* at ¶ 7.  As part of that

process, Mr. Hutchinson worked directly with Mr. Combo on an ongoing basis, and worked

closely with the persons being considered for the position, including Dwight Bower who

ultimately was hired by the Board.  *See id.* at ¶¶ 7-11.  In regard to the status of the Director

position, Hutchison states:

> Because of the language in Idaho Code §  40-503, it was my opinion
> [then], as it is today, that the transportation director is one of the most
> secure positions in Idaho state government.  The grounds for removal
> are set forth in the statute and are very specific and narrow.  This is
> different than many other directors in Idaho government, most of
> which are at-will and can be fired by the Governor very easily.  It is

---

employment ended.  *See generally* Hill Decl. (Docket No. 121).  Apparently, Ms. Hill's
testimony is intended to rebut, at least in part, the testimony of Mr. Bruneel.  However, the
information in Ms. Carlin's declaration is largely inapposite to the more central fact that Mr.
Bruneel's declaration, among other evidence in the record, runs against the grain of ITD's
contention that there was a long-standing, universally held, understanding that the ITD Director
was purely an "at-will" employee.

**MEMORANDUM DECISION AND ORDER - 39**

my belief through discussions I had with Chairman Combo that he
agreed with this interpretation of the statute.

*See id*. at ¶ 12.[15]

      h.    *Dwight Bower*

Dwight Bower, the Director hired in 1993 after the search assisted by Mr. Hutchison, was

deposed in this case.  Among other things, he testified that he was very much concerned about

the nature of the ITD Director's employment status, and whether it was a political appointment,

such as by the governor, or something else:

> As a part of the discussion process that I had – and primarily it was
> with Dick Hutchinson, some with the board.  And when I say "the
> board" it was primarily the board chairman [Jack Combo].  I had
> questions on where did this position fit into the state system . . . .
>
> In Colorado [where Bower was then working], the director is
> appointed by the governor.  So I was interested in knowing, one, is
> this a governor-appointed position.  And I was more interested, I
> suppose, in finding out did it flow with governor changes, which is
> not uncommon.
>
> And I was told that it was not, that the appointment was from the
> board, and that there was a statute that governed the director's
> position in Idaho Code. . . . .
>
> I did look up that statute obviously, or Dick gave it to me, I don't
> remember which.  But I read the statute and concluded that it was not
> an at-will position.
>
> I asked the question of Dick Hutchinson.  Is this an at-will position?
> And his response was, No.  It's governed by the statute.
>
> [T]o put it in layman terms, general terms, to move away from my
> wife, who had a job, to move to another location, sell a house, buy a

---

[15]  The Court is aware that Mr. Combo, who was a much-admired Idaho Falls attorney, is
now deceased.  He served multiple terms on the ITD Board, appointed by several governors, of
both political parties.

**MEMORANDUM DECISION AND ORDER - 40**

house, go through all of that, it was actually of great interest. Is this a short-term job or does it have the potential of going on based on my performance? I mean, that was extremely important. And that's the reason I pursued the question.

See Bower Depo. at 17:20-23:10, attached as Ex. O to Squyres Decl. (Docket No. 123, Att. 1).

Mr. Bower further explained his understanding of the Director position in this manner:

Q.    Mr. Bower . . . . you had referenced this particular statute, the 40-503. . . . . If you look at subsection 1, the second sentence starts, "The director shall serve at the pleasure of the board and may be removed by the board for inefficiency, neglect of duty, malfeasance, or nonfeasance in office." Do you see that sentence?

A.    Yes.

Q.    Is that the relevant sentence that you were referring to in your understanding of how your performance fit into your employment as ITD director?

A.    Yes.

Q.    And you talked a little bit about how you interpreted the phrase "serve at the pleasure of the board." Did you attach any meaning or significance–or what was your understanding of the rest of that sentence that talks about your removal?

A.    Which sentence are you referring to ?

Q.    I'm sorry. The same sentence. It goes on to say, "And may be removed by the board for inefficiency, neglect of duty, malfeasance, or nonfeasance in office."

A.    And what's your question?

Q.    Did you have an understanding as to what that meant with respect to your employment?

A.    My understanding, which is all I can give you at this point, is that these were, these four items that were listed, were, in fact, the measure under which I could – if I failed to perform under these four items, I could be dismissed. Actually, it says "may be dismissed."

Q.    . . . . But was it your understanding that in order for the board to remove you

**MEMORANDUM DECISION AND ORDER - 41**

from your position as ITD director, one of those four things had to be at play? . . . .

A.      Okay.  The answer is yes.

*See id.* at 20:4-22:20.

Significantly, when questioned further on in his deposition by ITD's counsel, Bower said that even though he believed he was not an "at-will"employee, he also did not think he was a "classified" employee.  *See id.* at 65:25-69:7.  In that regard, he distinguished between the sort of due process protection that he understood would attach to his position as Director, compared to someone who was a classified employee, stating: "I believe that Section 40-503 outlines – and we're talking about termination – the four items for which a Director may be terminated.  And I'm saying my expectation is that a due process would occur if one of those four were called into play."  *See id.* at 85:15-19.  To his credit, Mr. Bower also acknowledged that he did not know what was the ITD Board's understanding of the same statute.  *See id.* at 90:19-91:1.

**D.      The Court's Reasoning and Decisions Drawn from the Added Evidentiary Record and the Argument of the Parties about the Legislature's Intent**

The Court has considered, in depth, the materials added to the record offered in support of the submitting parties' particular statutory interpretations.[16]  However, even after considering

---

[16]  The Court makes note here of an additional argument presented by Lowe to buttress her position that Idaho Code section 40-503 creates more than an at-will employment relationship, Lowe also points out that, in 2009, Senate Bill 1160 (had it passed) would have amended Idaho Code section 40-503 to, among other things, eliminate the list of reasons for the ITD Director's removal – suggesting that, as currently written and applicable here, Idaho Code section 40-503 expressly limits the reasons for removing the ITD Director.  *See* Pl.'s Mem. in Supp. of Mot. for Partial Summ. J., pp. 18-19 (Docket No. 101) (citing Pl.'s Supp. Brief, pp. 8-9 (Docket No. 49) ("If the Director could already have been removed without cause, there would have been no need for the proposed amendment.")).  However, Senate Bill 1160 did not pass.  Moreover, what may or may not have been the intention of the Idaho Legislature in 2009 does not provide any significant insight into the Idaho Legislature's frame of reference during the

**MEMORANDUM DECISION AND ORDER - 42**

the enlarged record representing the legislative history here, the Court is convinced that its plain

meaning reading of section 40-503 is also the Legislature's intended meaning, as has been set

out to some degree in the Court's discussion of the declarants' testimony above, and as the Court

will describe more fully here.

In the Court's view, the argument gleaned from the current record by ITD is largely

directed at a unsupported premise – to wit, (1) that the position of the ITD Director is either a

classified or a non-classified employee; (2) non-classified employees are at-will employees with

no property interest and due process rights in their continued employment; (3) the ITD Director

is not a classified employee (as the parties have stipulated, early on in the case); and (4)

therefore, the Director is an at-will employee with no property interest and due process rights in

continued employment.

The fallacy in the syllogism is the assumption that whether the ITD Director has any

property interest in his or her employment (and due process rights as to any decision by the ITD

Board to end that employment) is answered centrally by whether or not the ITD Director is a

classified or non-classified state employee.

Title 67, Chapter 53 of the Idaho Code creates a personnel system for Idaho state

employees.  The beginning point of that system differentiates between "classified" employees

and "non-classified" employees.  In its most simple characterization, each state employee is a

classified employee unless his or her specific position is specifically excluded from that status.

*See* I.C. § 67-5303.

---

reorganization process in the early 1970s.  It represents an interesting nugget of information, the
import of which, however, is much attenuated at best.

**MEMORANDUM DECISION AND ORDER - 43**

Classified employees are subject to the Personnel System Act contained in Chapter 53, "and to the system of personnel administration which it prescribes." *Id*. The purpose of the personnel system, for classified employees, "is to provide a means whereby classified employees of the state of Idaho shall be examined, selected, retained and promoted on the basis of merit and their performance of duties . . . ." I.C. § 67-5301. Included in that system is the statutory establishment of due process procedures, prescribed in this manner:

> No action of a participating department relating to a disciplinary dismissal, suspension or demotion, or an involuntary transfer shall be effective until the affected employee shall have received notice and an opportunity to be heard. The employee may then appeal to the Idaho personnel commission those disciplinary matters set forth in section 67-5316(1)(a), Idaho Code.

I.C. § 67-5315(2).

Chapter 53 does not, however, define whether a nonclassified employee has any property interest in his or her employment, or, if so, what due process rights accompany that property interest. The Act simply says that some employees are "non-classified," and therefore are not subject to the "system of personnel administration" prescribed in Chapter 53. It is evident therefore, but not dispositive for purposes of this lawsuit, that a non-classified employee does not have the specific due process rights provided to a classified employee – by definition, Chapter 53 does not extend those specific rights to non-classified employees.

For many non-classified employees, the nature of their employment is so constrained that it cannot reasonably be argued that any sort of property interest exists in their employment. However, the Legislature did not declare that all non-classified employees have no property interest, nor that each and every non-classified employee is a purely "at-will" employee. Many Idaho statutes, including some described in this decision and discussed at length in the briefing

**MEMORANDUM DECISION AND ORDER - 44**

filed by the parties, set out conditions of employment for a particular non-classified employee.[17]

These conditions may include a term of office (a pure at-will relationship has no right to any

term of office), or a defined (and thereby limited) set of conditions upon which a non-classified

employee can be removed from employment.  In some cases, both such types of restrictions

exist.  The particular details are not as important for purposes of the instant case; rather, the

significance is in the fact that *even if* a particular state employee is not a classified employee, he

or she may still have certain rights in his or her employment – as granted by the legislature

separate and apart from the classified employee system.

 Accordingly, the testimony by many of the declarants who say that there is an absolute

distinction between classified employees (and property rights in their employment) and non-

classified employees such as agency directors (who can never have a property right in their

employment), and the argument drawn from their testimony, is not consistent with what the

Idaho legislature has done in regard to many positions of authority in state government.  Even in

the process of the reorganization of the executive branch in the early 1970s, there was particular

discussion of those points both in the Commission proceedings and the public comment that

accompanied it.  What there was not, at least to this Court's review, was a completely uniform,

purely at-will, treatment of all agency directors (and board members), as to the nature of their

employment status as non-classified employees.[18]

---

[17]  This discussion is not intended to implicate those exceptions to the at-will employment
doctrine that are derived from public policy constraints, such as age, race, or gender
discrimination.

[18]  Joy Buersmeyer, a citizen member of the Commission, testified in a declaration
offered by Lowe that she did not "recall any comments, discussions or an agreement amongst the
Commission members that we need treat all agency directors the same with respect to their

**MEMORANDUM DECISION AND ORDER - 45**

Hence, one underpinning of ITD's argument fails to support its weight.  That is, the record does not support ITD's argument that the ITD Director cannot be anything other than a purely at-will employee, because the Commission, the Legislature, and Governor Andrus intended that all agency heads be treated that way.  The question then turns to whether there was something so anomalous about the language used in Idaho Code section 40-503 that the Court should conclude that the phrase ". . . and may be removed by the board for inefficiency, neglect of duty, malfeasance or nonfeasance in office" has no meaning.

The consideration of this question begins, in part, with ITD's argument that the language is anomalous because no other agency directors are treated in such a fashion.  As described above, there is no pervasive uniformity in the employment description of all of the various state agency heads.  Accordingly, there is no anomaly in section 40-503 merely because it is somewhat different in its language than other statutes of a common purpose.

Next, the Court has considered ITD's argument that the Legislature could not possibly have intended the ITD Director to have some due process protection in his or her employment, because no one seems to think that was the intent of either the Commission, or the Legislature, and no one seems to remember how the particular "and may be removed" language found its way into the statute.

If the record contained some evidence that there had been a scrivener's error that went unnoticed and undetected in the course of a large, multi-faceted, legislative overhaul of state

---

employment protections."  *See* Buersmeyer Decl. at ¶ 9 (Docket No.107).  She also testified that the major topic discussed regarding the ITD was to keep the Board of Directors to oversee the ITD "and that the Director was to report directly to the Board of Directors as opposed to the Governor."  *See id*. at ¶ 8.

**MEMORANDUM DECISION AND ORDER - 46**

government, there might be some persuasive value to this part of ITD's argument.  But the record is to the contrary.  The record establishes that there was discussion as to many of the agencies about how the agency head should be selected, and whether it should be by the governor or an agency board.  The record establishes that there was discussion about whether agency heads should serve a term of office, and whether an agency director's dismissal from employment should be conditioned upon some evidence of particularized faulty performance. The record establishes that the drafts of the legislation were carefully prepared by the professional staff of the Commission, and that everything was reviewed by the Commission's counsel, Governor Smylie, before it was put into final form.  The record establishes that details of the agency director employment status were part of the Commission's formal "Explanation" to the Legislature about the proposed legislation, including as to the ITD Director that the ITD Board  was to "appoint a director having knowledge and experience in transportation matters, who shall serve at the pleasure of the board and may be removed *only* for stated cause." Proposal No. 12/Explanation (Docket No. 49, Att. 9)  This provision, of the Commission's detailed explanation of the purpose of the Legislation, is – in the Court's view – the most persuasive piece of legislative history evidence, particularly when considered against the broad context just described.  And, of course, the language of the proposed legislation setting out such conditions was there, in black and white – unadorned perhaps, but in plain view.

Additionally, the Commission and the Legislature were dealing with very similar issues in regard to the ITD Board itself. There was concern about protection from undue political influence.  There was a concern about obtaining and maintaining professionalism in one of the largest agencies in government (in both employee numbers and budget).  The Commission

**MEMORANDUM DECISION AND ORDER - 47**

considered various options to deal with those concerns, and ultimately chose to create an ITD

Board that was very similar to the pre-existing Board of Highway Directors.  In doing so, and in

recommending a final form of the ITD Board to the Legislature, the Commission came up with

very similar language to that of the Director's position.  First, the board members are appointed

by the governor,  provided they meet certain qualifications.  *See*, I.C. § 40-302.  Then, while

serving, a board member "may" be removed by the governor for incompetency, inefficiency,

intemperance, misconduct in office, neglect or dereliction of duty."  *See*, I.C. § 40-305.  Just as

with the Director, the board members are appointed in the discretion of the appointing authority,

provided that the person meets the statutory qualifications.  Following the appointment, the

person "may" be removed by the appointing authority if that person's performance implicates

one of the stated reasons for removal from office, again in the discretion of the appointing

authority.

The Court understands, and finds somewhat problematic, the fact that most other

similarly-situated agency directors to the ITD Director generally have a prescribed term of

employment, or a specified process for notice to be given to the employee of plans to terminate

their employment, with an opportunity to be heard.  ITD argues that even if the Court listens

closely to Lowe's argument about section 40-503's "may be removed" clause, the fact that there

is no specified term to the Director's employment, and no specified process for notice and

opportunity to be heard, eviscerates any possibility that the ITD Director is anything but an at-

will employee.

The Court discussed this issue in its proposed decision, in a manner that elicited criticism

from various of the declarants who have provided testimony on behalf of ITD, and the Court has

**MEMORANDUM DECISION AND ORDER - 48**

reconsidered its earlier assessment of what may or may not have been on the Commission's collective mind, and the Legislature's collective mind, at the time that sections 40-305 (dealing with the ITD Board) and 40-503 (dealing with the ITD Director) were enacted.  After doing so, the Court remains persuaded that its original perspective is still the most sensible assessment of the legislative intent behind section 40-503, and that accordingly, even if the statute is deemed ambiguous, the same meaning that the Court attaches in its reading of the "plain meaning" of the statute so as to give effect to each part of its language, is also the Legislature's intended meaning.        The record before the Court also contains information that provides a sensible explanation for the ITD structure contained in the Commission's proposal, regardless of whether or not a set term of office was included for the Director, or whether a specific notice and opportunity to be heard was spelled out. To begin, the Court found multiple references to concerns over the role of politics in highway decisions, including the telling comment of Senator Ralph Yarbrough in one Commission meeting when discussing how to organize the new ITD, that he could "remember before we had the highway board, it was kind of a political issue–if you had enough political muscle, you could get consideration." *See* (Docket No. 49, Att. 4).

　　　　Further, as the Court described in its proposed order, Idaho's history always has been marked by regional interests competing for transportation project dollars. Our state is divided by geography and culture into distinct regions, where business and economic decisions do not always honor or value political boundaries.  Although any decision made upon transportation projects can have statewide impacts,[19] the regional impacts are potentially greater – both in the

---

　　　　[19]  Compare the time needed to travel from the Treasure Valley to the Idaho Panhandle today compared to 30 years ago, shortened dramatically by improvements to our north/south highway system at such places as Horseshoe Bend Hill, Whitebird Hill, Lawyer's Creek Canyon,

**MEMORANDUM DECISION AND ORDER - 49**

immediate infusion of huge construction dollars into a local economy, as well as the longer-

lasting economic benefits from highway improvements, new freeway and divided highway

interchanges, shortened travel times, and so forth.

The competition for such projects has always been fierce; the dollars for such projects

limited.  Hence, there is a logic that the Commission recommended, and the Legislature created,

an ITD Board that continued to represent specific regions of the state (as the Board of Highway

Directors had done previously), thus ensuring that each region's interests would be represented,

but also in a way that would encourage cooperation to meet statewide interests.  *See, e.g.*, I.C.

§ 40-303.  The direct political influence of the governor was thereby constrained, but not

eliminated, as the governor was given the responsibility to appoint the board members, but also

limited in how he or she might seek to remove such board members.  *See* I.C. § 40-302.   In that

regard, the Legislature set specific time periods upon the term to be served by these Board

members and specifically outlined the procedures to remove members.  *See* I.C. §§ 40-303, 40-

305.  A political balance was required of the Board, with a prescribed equilibrium imposed

between the two major political parties in the state.  *See* I.C. § 40-302.  The Legislature

prohibited any Board member from serving in a separate elective, appointed, or political party

position.  *See id.*  In so doing, the Legislature unmistakably was seeking to create a decision-

making body that would reflect the regional interests competing for transportation projects, but

would be a layer removed from the direct political influences that might seek to place a thumb

upon such decisions.

The Legislature then created a professional position in the form of the ITD Director, in a

manner that emphasized the need to operate the engineering, oversight, and public fisc

---

Lewiston Hill, Worley, and so on.

**MEMORANDUM DECISION AND ORDER - 50**

responsibilities of the ITD in a professional manner. *See, e.g.*, I.C. § 40-505. The person filling

that position was to both advise the Board and manage the Department as the "technical and

administrative officer of the Board," and, under the Board, was to have "general supervision and

control of . . . the department." *See id.*

As with other of the many "citizen" boards of Idaho state government, the part-time ITD

Board members (although "well informed and interested in the construction and maintenance of

public highways and highway systems (*see* I.C. § 40-302)) generally have neither the time nor

the expertise to manage the operations of the agencies on a daily basis. Their responsibility is to

set policy and to make decisions upon the major directions of the agency. Such boards, by

design and by circumstance, change in composition from year to year. Each time a Board

member departs, that Board member's collective institutional knowledge gained from his or her

tenure on the Board, is lost, and the new member must begin anew to gain such knowledge.

More often than not, the Board member does not have technical or specialized training in the

particular work of the agency, even though they may gain a working understanding of such

things in the course of their service. Necessarily, however, in such a setting, the institutional

knowledge and expertise of the agency employees, particularly the Director, is critical to

assisting the Board in making sound and informed decisions.

Hence, the Legislature understandably could have chosen to structure the ITD Director's

position to meet that need. Unlike the Board members, who can come from entirely unrelated

professional or educational backgrounds, Idaho Code section 40-503 requires the ITD Board to

"appoint a director having knowledge and experience in transportation matters." *See* I.C. § 40-

503. The Legislature additionally required that "[t]he director *shall not* hold any other public

**MEMORANDUM DECISION AND ORDER - 51**

office, nor any office in any political committee or organization, and *shall* devote full time to the performance of his official duties. *See id.* Furthermore, it is the ITD Director who is charged with "appoint[ing] a chief engineer of the department" with "actual experience in highway engineering . . . in an administrative capacity involving the direction of a substantial technical engineering staff." *See id.*; *see also* I.C. § 40-503(2).

The requirement that the ITD Director be professionally qualified by "knowledge and experience in transportation matters" was further evidence that the Legislature also understood that even in that position, the Director needed to be able to professionally manage ITD, without fear of political reprisal. Yet, such a position cannot have been intended to create a taxpayer-funded sinecure for the incompetent or irresponsible; hence, the Legislature identified four specific reasons–inefficiency, neglect of duty, malfeasance or nonfeasance--of unsatisfactory performance upon which the Board could choose to discharge the Director.

The Court has given careful attention to the fact that some of the players on the field at the time – Governor Andrus, Governor Batt, and General Manning in particular – have said in their declarations that this Court's assessment of the legislative record is, to paraphrase, "not the way it was." But in the Court's view of the entire record and the argument of the parties, the conclusion reached here is more consistent with the purposeful, repeated, references to the "may be removed only for cause" nature of the ITD Director's position found in the Commission's records (including the legislation's Statement of Purpose), and is more consistent with the nature of the testimony before the Commission about the need for a relative degree of autonomy in the workings of the ITD. The Court's decision is also more consistent with the Commission's and the Legislature's decision to give certain other large agency directors, and agency board

**MEMORANDUM DECISION AND ORDER - 52**

members, limited protections in their employment, and is more consistent with the underlying

public policy behind a Legislature choosing to encourage apolitical decision-making in one of

the state's largest agencies.

The Court is not saying, in reaching this decision, that the Legislature could not have

chosen differently.  The Court is satisfied that the declarants such as Governors Andrus and Batt

genuinely believed that the position of the ITD Director was constructed differently than it was,

and that they believe that if it was not created as a purely at-will position, it should have been.  It

is even possible that there was some missed detail in the Commission's final work-product as to

the ITD and its Director, given the breadth of the executive branch overhaul that took place over

those several years leading up to the 1974 legislative session.  However, the Court concludes that

if there was any such oversight, it is much more likely that the oversight was in not setting a

particular term for the Director's position, or perhaps even in not setting the details of due

process rights that would follow an decision to terminate the Director, such as had been done

with director positions, and board positions, in some other departments.  Those are matters that

are easily remedied, if the Legislature concludes that some important detail was left undone in

1974, but that has not happened.  Ultimately, however, the Court concludes that the manner of

selecting the ITD Director, and the manner by which he or she could be removed from that

office, was explicitly described by the Commission to the Legislature, and passed by the

Legislature in that form.  Those details cannot be considered, under any understanding of the

terms, an oversight or a mistake.

With all this in mind, the Court concludes that its reading of what it has described as the

plain meaning of the statute is also consistent with this above-referenced legislative backdrop.

**MEMORANDUM DECISION AND ORDER - 53**

Accordingly, the Court finds that the statute's meaning supports Lowe's position that she had a property interest as ITD's Director.

**E.      Lowe's December 14, 2006 Offer Letter is Not Dispositive of Her Claims**

ITD has argued that even if section 40-503 extends a property right interest to the ITD Director, in Lowe's instance, she knowingly surrendered any such rights at the time she was hired.  ITD points to the December 14, 2006 employment letter agreement between (and signed by) Lowe and ITD's then-Chairman, Frank Bruneel, which states in part: "[t]his position is non-classified by Idaho Code 67-5303 and, therefore, is an 'at-will' position.  *See* Ex. A to Defs.' Answer to Second Am. Compl. (Docket No. 9, Att. 1).  Lowe has argued that this letter's content does not operate to overcome the requirements of section 40-503 concerning removal of the ITD Director.  *See* Pl.'s Mem., p. 10 (Docket No. 22) ("It stands to reason that similarly, ITD cannot override I.C. § 40-503 with an offer letter dictating that Ms. Lowe's position 'is an 'at-will' position.'") (citing *Boudreau v. City of Wendell*, 213 P.3d 394 (Idaho 2009)).

In *Boudreau*, the appellant was appointed to the position of Wendell City Clerk and, at the time of her appointment, was provided with a Personnel Manual, outlining "the right to notice and a hearing for employees in the event of discharge or demotion."  *See Boudreau*, 213 P.3d at 395.  Following her August 29, 2007 dismissal, the appellant brought a claim, asserting that the defendants/respondents "wrongfully terminated her employment when she was not provided with notice and a hearing as provided for in the Personnel Manual."  *See id.* at 396. The district court granted summary judgment, holding that, "while portions of [the appellant's] employment may have been governed by the employment handbook, the Idaho Legislature

**MEMORANDUM DECISION AND ORDER - 54**

determined that the means by which a city clerk is removed is to be exclusively governed by the terms of I.C. § 50-206." *See id*.  The Idaho Supreme Court agreed, concluding:

> Moreover, in Idaho[,] local governments cannot override statutes enacted by the legislature.  Thus, once the legislature determined that a municipal appointive officer is at-will and provided for the removal of such an officer without notice or a hearing, the municipality could not alter that status by adopting a Personnel Manual.

*See id*. at 397.

ITD argues that *Boudreau* does not support Lowe's cause because "Lowe did not attempt to contract for additional procedural rights" but, instead, "Lowe acknowledged the at-will nature of her employment as Director and expressly waived any right to now argue that she had an expectation of continued employment."  *See* Defs.' Opp., p. 18 (Docket No. 28); *see also* Defs.' Resp. to Req. for Add'l Briefing, p. 20 (Docket No. 50).  While not taking issue with ITD's factual distinction from *Boudreau*, the Court disagrees with ITD's application of *Boudreau* to Lowe's circumstance here.

The take-away from *Boudreau* is that Idaho Code prevails over a conflicting contract, manual, or, even letter.  Therefore, regardless of what the December 14, 2006 letter said with respect to the nature of Lowe's employ as ITD's Director, section 40-503 nonetheless controls. So long as section 40-503 provides a property interest in the ITD Director's continued employment, statements to the contrary via any employment agreement like the December 14, 2006 correspondence do not apply to marginalize the Legislature's mandate.[20]  Therefore, Lowe's December 14, 2006 Offer Letter is not dispositive of Lowe's Claims.

_____

[20] Even when adopting ITD's argument that Lowe cannot "contract for additional procedural rights" the same reasoning could be applied against ITD.  That is, where Idaho Code section 40-503 indicates a property interest in the ITD Director's continued employment, ITD cannot enjoy arguably "additional procedural rights" (and, therefore, permit it to fire the ITD Director at its will) through the December 14, 2006 letter between Lowe and Frank Bruneel.

**MEMORANDUM DECISION AND ORDER - 55**

**F.       The Meaning of this Decision in the Context of the Case Going Forward**

This Decision represents a rather exhaustive explanation of the Court's ruling upon the pending cross motions for partial summary judgment.  But it also important to describe, albeit more briefly, what is not decided here.  The Court has not decided the parameters of the property interest held by the ITD Director in the context of the due process rights that must attend to any decision made by the ITD Board seeking to terminate the Director.  Accordingly, the Court also makes no decision as to whether Lowe's rights in that regard have been violated.

However, at a minimum, the Court necessarily concludes in reaching the conclusion described above, that the ITD Board is required to act upon a legitimate record in making its decision as to whether or not Lowe's performance as the ITD Director justifies the termination of her employment based upon any one or more of the four specified reasons for removal set out in section 40-503.  The corollary is that Lowe is entitled to challenge the process by which the decision to terminate her was made, to support her claim that the decision to relieve her of her command was made for reasons not allowed by the statute.

Depending upon what the Court decides are the protections to which Lowe is entitled, ITD will be entitled, in turn, to argue that such protections (even though contested) were provided to Lowe.  Indeed, from the record now developed by the parties, it appears to the Court that ITD will be able to argue that, at a minimum, Lowe was given notice of the Board's complaints with her performance.  Whether any such argument ultimately prevails, and the contours of the rights to which Lowe was entitled, are yet to be determined.

Those issues will surely be the subject of further briefing and argument from the parties. The Court will hold a status conference and scheduling conference with the parties in the next

**MEMORANDUM DECISION AND ORDER - 56**

several weeks to set a time frame for those matters, and the other remaining claims in this lawsuit.

## IV.  <u>ORDER</u>

Based upon the foregoing, IT IS HEREBY ORDERED that: (1) Lowe's Motion for Partial Summary Judgment (Docket No. 100) is GRANTED;[21] (2) ITD's Motion for Partial Summary Judgment (Docket No. 117) is DENIED; and (3) Lowe's Motion to Strike (Docket No. 130) is DENIED as moot.



DATED:  **March 31, 2012**

_____
Honorable Ronald E. Bush
U. S. Magistrate Judge

---

[21]  Because, through this Memorandum Decision and Order, this Court grants Lowe's Motion for Partial Summary Judgment, the Court need not address Lowe's related Motion to Strike and, therefore, hereby denies the same as moot.

**MEMORANDUM DECISION AND ORDER - 57**